UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Lawrence John Laveau, | Civil No. 11-505 (SRN/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Michael J. ASTRUE, Commissioner of the Social Security Administration, | |
| Defendant, | |

Lawrence John Laveau (Plaintiff) seeks judicial review of the decision of the Commissioner of Social Security (Defendant) denying his application for disability insurance benefits (DIB).  The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g).  Both parties submitted motions for summary judgment.  For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

## I.    BACKGROUND

### A.  Procedural History

Plaintiff filed his application for DIB on April 17, 2006, alleging a disability onset date of December 31, 2005.  (Tr. 117-119).[1]  His application was denied initially and upon reconsideration.  (Tr. 62-66, 70-75).  Upon Plaintiff's request for a hearing, Administrative Law Judge Roger W. Thomas (ALJ) held a hearing on October 9, 2008.  (Tr. 20).  The ALJ denied

---

[1] Throughout this Report and Recommendation, this Court refers to the administrative record [Docket No. 7] for the present case by the abbreviation "Tr."

Plaintiff's claim on February 18, 2009.  (Tr. 19).  The ALJ found that from December 31, 2005

through the date of the ALJ's decision, Plaintiff was not disabled within the meaning of the

Social Security Act.  (Tr. 19).  Plaintiff sought review of the decision by the ALJ and submitted

additional medical evidence to the Appeals Council.  (Aff. of Sean Quinn [Docket No. 8] at 4).

The Appeals Council reviewed the additional evidence but denied the request.  (Tr. 1-2).[2]

Because the Appeals Council denied Plaintiff's request for review, the ALJ's decision became

the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981.

### B.  Factual History

Plaintiff was 53 years old at the time that he filed his application.  (Tr. 23).  He is a high

school graduate and received some additional training and schooling in the military.  (Tr. 27).

He has a driver's license and is able to drive, although he prefers to have his wife drive when

possible.  (Tr. 27).  Prior to his alleged disability, he was employed in the Air National Guard.

(Tr. 32).  He retired in 2004.  (Tr. 32).  Since his retirement, he's maintained several part-time

jobs in carpentry, demolition, remodeling, and general construction work.  (Tr. 28-30).  On one

particular job in the fall of 2007, Plaintiff worked 40 hours per week for five weeks at $35 per

hour.  (Tr. 30).  He has never been hospitalized for psychiatric reasons since the end of 2005.

(Tr. 30).  After his alleged onset of disability, he went through a divorce with his wife at that

time.  In August of 2007, Plaintiff remarried, which he provides is going very well.  (Tr. 34).

At the hearing, Plaintiff stated that he is unable to work because his mental health

impairments make him "lose [his] common sense."  (Tr. 39).  He testified that he was fired from

his previous part-time jobs because of careless mistakes he made.  (Tr. 39).

---

[2] Plaintiff argues that the Appeals Council only considered part of the evidence he submitted, and the Court addresses that argument below.

Despite his mental health impairments, he admits that he is capable of doing a variety of activities and tasks by himself.  He is able to walk without any limitations and uses an elliptical machine for exercise.  (Tr. 27-28).  He is able to take care of himself and perform chores around the house such as laundry, dishes, and cooking.  (Tr. 28).  He mows the lawn, vacuums, and cleans the house.  (Tr. 41).  Although he does not like going shopping by himself, he is able to go grocery shopping with his wife.  (Tr. 37).

### C.  Medical Evidence for the Relevant Time Period [3,4]

Throughout his course of mental health treatment, Plaintiff has visited numerous psychiatrists and mental health professionals.

On June 13, 2006, Plaintiff sought treatment from staff psychiatrist Larry G. Broome, M.D.  (Tr. 382).  Dr. Broome noted that Plaintiff suffered from depressive episodes.  However, he described Plaintiff's mood only as moderately depressed and his affect as moderately constricted and assigned Plaintiff a GAF score of 52.  (Tr. 382-83).  Plaintiff explained that he had a part-time job, his sleep pattern was adequate and that he had a good relationship with his three sons after a then recent divorce from his wife.  (Tr. 382).  In a follow-up appointment a month later, Dr. Broome made similar findings: depressive syndrome continued but Plaintiff's

---

[3] Plaintiff also submitted medical evidence from before his alleged onset disability date.  However, Plaintiff does not argue that any of the specific evidence from before the alleged onset disability date undermines the ALJ's conclusion.  Indeed, "[m]edical opinions that predate the alleged onset of disability are of limited relevance." Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1165 (9th Cir. 2008).  Nonetheless, the Court has reviewed the evidence that predates the alleged onset disability date and finds that it does not undermine the ALJ's decision, nor does it provide any significant evidence regarding Plaintiff's mental health status during the relevant time period.

[4] Plaintiff also submitted medical evidence from June of 2009 to October of 2010, all of which was after the ALJ's February 18, 2009 decision.  This evidence was considered and made part of the record by the Appeals Council. The Appeals Council found that this evidence was "about a later time" and that it did not affect the decision whether Plaintiff was disabled during the time period at issue in this case.  Nevertheless, the Appeals Council noted that Plaintiff "filed a new claim for disability insurance benefits on July 16, 2010 and that the above medical evidence is already being considered with [Plaintiff's] new claim."  (Tr. 2).  Plaintiff does not challenge the Appeals Council's decision nor does he argue that this later-submitted evidence undermines the ALJ's decision, rather Plaintiff argues that some of the new evidence submitted was not physically made a part of the record, and therefore, a reversible error exists; an argument which the Court addresses below.

mood was only moderately depressed and affect was only moderately constricted.  He again

assigned Plaintiff a GAF score of 52.  (Tr. 382).  On November 28, Dr. Broome again made the

same findings but explained that Plaintiff had begun benefitting from his medication—he

assigned him a GAF score of 55.  (Tr. 378).  On January 30, 2007, Dr. Broome again noticed

improvement, found Plaintiff's mood as only mildly depressed and his affect as mildly

constricted, and as such, assigned him a GAF score of 60.  (Tr. 378).  On a June 4, 2007 visit,

Plaintiff reported that his sleep pattern was adequate, he attended AA meetings regularly, he

enjoyed mowing the lawn, working in his sister's vegetable garden, and fishing.  (Tr. 617).  Dr.

Broome again noted that Plaintiff was only mildly depressed, affect was only moderately

constricted, and assigned Plaintiff a GAF score of 60. (Tr. 617).

Also in June of 2006, Plaintiff visited Robert W. Hoffman, Ph.D. for a psychological

evaluation.  (Tr. 347).  Plaintiff explained to Dr. Hoffman that he does not like crowds or

shopping and that he mostly stays to himself.  (Tr. 347).  He provided that his enjoyment is

"being by himself and, camping out in the woods."  (Tr. 348).  However, Plaintiff also provided

that he mows the lawn, shovels snow, keeps his room tidy, does laundry, and goes shopping,

though he waits until later in the evening when there are less crowds.  (Tr. 348).  He informed

Dr. Hoffman that he has no local friends and that he does not mix with people much or go to

church.  (Tr. 348-49).

Dr. Hoffman noted that Plaintiff's "facial expression was sad throughout and his eye

contact variable."  (Tr. 348).  He described Plaintiff's affect as flat and mood as depressed.

However, he noted that Plaintiff's flow of ideas was logical and well-connected.  (Tr. 348).

Plaintiff was able to follow instructions, recall three objects after five minutes without difficulty,

and recall seven digits forward, and six backward, indicating a "strong average performance

[which was] a little surprising in one with his problems." (Tr. 348). Dr. Hoffman found that Plaintiff can concentrate on and understand instructions given to him, but that he "does not retain instructions well enough to perform consistently and adequately when employed." (Tr. 349). Though he noted that Plaintiff "might not respond properly to co-workers and supervisors consistently in his depressed state," Dr. Hoffman also stated that Plaintiff "carries out tasks with close to reasonable persistence and pace." (Tr. 349). Dr. Hoffman concluded that Plaintiff "would not tolerate a normal amount of stress in the workplace" and assigned him a GAF score of 44. (Tr. 349).

In June of 2006, Plaintiff also sought treatment from J.C. Whitacre II, M.D and Sandra Lundgren, Ph.D., L.P. (Tr. 398-99). On June 8, 2006, Dr. Lundgren performed a neuropsychological compensation and pension examination. (Tr. 393). Dr. Lundgren noted that although Plaintiff's depression and anxiety have been treated since 1991, they had become worse in recent time. (Tr. 395). In a test asking him to recall fifty pictures he was shown, Plaintiff scored within the acceptable range. (Tr. 396). In other attention, memory and concentration tests, Plaintiff again received average scores. (Tr. 396-97). Dr. Lungren concluded that Plaintiff "continue[d] to function within normal limits." (Tr. 398). She found that his "[p]erformance on measures of attention and concentration again reflect mild processing slowness but are stable to improved since 5/04." (Tr. 398).

On a June 21, 2006, mental health visit, Dr. Whitacre noted that Plaintiff's depression symptoms had caused Plaintiff to "us[e] alcohol at a serious level, drinking a couple of 12-packs a week." (Tr. 398). Plaintiff provided that his depression had become worse recently. (Tr. 399). Dr. Whitacre described Plaintiff as a "pleasant, oriented, alert[,] and cooperative." (Tr. 399). He

noted that Plaintiff's affect was appropriate, with a sense of underlying depression.  (Tr. 399).

Dr. Whitacre assigned Plaintiff a GAF score of 60.  (Tr. 399).

On July 17, 2006, state agency consultant Dan Larson, M.D. performed a mental residual

functional capacity assessment.  (Tr. 365).  Dr. Larson noted that Plaintiff suffered from an

affective disorder (depression), an anxiety-related disorder (generalized anxiety), and substance

addiction disorders.  (Tr. 351).  Under "criteria B" listings, Dr. Larson found the following

functional limitations: mild in restriction of activities of daily living, moderate difficulties in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence or

pace, and no episodes of decompensation each of extended duration.  (Tr. 361).  Dr. Larson

found no marked or extreme functional limitations in any of the criteria.  (Tr. 361).  He also

noted that the evidence did not establish the presence of "criteria C."  (Tr. 362).  In his more

detailed findings, Dr. Larson noted that Plaintiff had no significant limitation in understanding

and memory, with the exception of the ability to understand and remember detailed instructions,

which were moderately limited.  (Tr. 365).  Under concentration and persistence, Dr. Larson

found no significant limitation in the majority of abilities but moderate limitation in the

following: ability to carry out detailed instructions, ability to maintain attention and

concentration for extended periods, and the ability to sustain an ordinary routine without special

supervision.  (Tr. 365).  Dr. Larson found no significant limitation in Plaintiff's ability to

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods.  (Tr. 366).  Under social interaction and adaption, he found no significant limitation in

any of the abilities except for the ability to interact appropriately with the general public, which

Dr. Larson found moderately limited.  (Tr. 366).  Importantly, Dr. Larson did not find any

marked or greater limitation in any of the categories.  (Tr. 366).  Dr. Larson concluded the

following: Plaintiff's depression was mild; Plaintiff "does not socialize a lot but does not cite

problems getting along with peers or with authority"; Plaintiff's "[c]oncentration is seen on C/E

to be objectively sufficient"; Plaintiff's "ability to cope with co-workers would be reduced but

adequate for brief and superficial contact."  (Tr. 367).

On August 31, 2007, Plaintiff visited staff psychiatrist Hyensoon E. Park.  (Tr. 613).

Plaintiff reported that he "was doing reasonably well until recently when he relapsed on alcohol

after 3 months of sobriety despite attending two AA meetings a week and having two sponsors."

(Tr. 611).  Plaintiff reported sleep difficulties, depressed mood, anxiety, irritability, and

decreased concentration but a fair appetite, a good energy level, and enjoyment in some

activities.  (Tr. 612).  Mr. Park assigned Plaintiff a GAF score of 50-55 and provided him with

"minimal supportive psychotherapy and medication education."  (Tr. 612-613).

In April of 2008, Plaintiff underwent a psychological examination by psychologist John

N. O'Neil, Ph.D.  (Tr. 592).  At that time, Plaintiff described "his typical mood as 'pretty basic,'

every once in a while [he'll] have [a] bad day every couple of weeks, get down depressed, start

worrying a lot," but indicated that his "medication has been helpful in managing depression and

anxiety."  (Tr. 588).  He reported having a "fantastic" relationship with his new wife at that time

and having "great" relationships with his children.  (Tr. 589).  He also reported having a "close

friend from the service, and another friend who lives in N.C."  (Tr. 589).  Dr. O'Neil, Ph.D.

noted his affect as appropriate, his mood as fairly stable most of the time, his attention as good

(being able to perform a concentration and attention test successfully), and his thought process as

unremarkable.  (Tr. 590).  He also noted no inappropriate behavior and no problem with

activities of daily living.  (Tr. 590).  In assigning a GAF score of 63, Dr. O'Neil noted that there

was no total occupational and social impairment due to mental health and Plaintiff's mental disorder signs and symptoms did not resulted in deficiencies in judgment, thinking, family relations, work, or mood.  (Tr. 592).

On July 23, 2008, Plaintiff visited psychologist Kiri Faul, Phd., LP.  (Tr. 1173).  Plaintiff reported losing his logic and commonsense when he was working and reported depression.  (Tr. 1168).  However, he rated his mood at a 5 and stated that he "has a good life."  (Tr. 1168).  He informed Dr. Faul that he "does not really get too depressed either, but just stays in the middle."  (Tr. 1168).  He reported that his energy was okay if others were around, explaining that if "others prompt him to do an activity, he does do so and will have adequate energy and enjoy it."  (Tr. 1168).  Plaintiff also stated that "he can concentrate on a task 'to a point,'" but when he becomes forgetful he loses focus.  (Tr. 1168).  In his psych evaluation, Dr. Faul noted that Plaintiff had full affect, a good mood, intact attention, unremarkable thought process, unremarkable thought content, and good judgment.  (Tr. 1169).  Plaintiff was able to perform several attention and concentration tests successfully.  (Tr. 1169).  Dr. Faul found that Plaintiff had no inappropriate behavior and no panic attacks.  (Tr. 1170).  When evaluating Plaintiff's ability to engage in daily living, Dr. Faul noted a moderate limitation only in driving and none or slight in all other categories—no marked or severe limitations in any category.  (Tr. 1170).  He also found that Plaintiff's memory was only moderately impaired.  (Tr. 1171).  Dr. Faul assigned Plaintiff a GAF score of 63.  (Tr. 1172).  Finally, when evaluating Plaintiff's employability, Dr. Faul made the following comments:

> [T]he veteran appears capable of working from a psychological standpoint. His depressive symptoms that he reports are not to the extent that would qualify him as being unable to hold gainful employment. In addition, his MH treatment records indicated this veteran has made progress in terms of his mental health symptoms and that his depression is now in partial remission. He may have some

limitations due to lack of motivation and energy, but overall, would seem capable
of holding gainful employment based on his current mental health symptoms.

(Tr. 1172).

Plaintiff also visited Patricia Michals, M.S., A.P.R.N., B.C., for mental health treatment.
In April of 2007, Plaintiff rated his depression at 6 on a scale of 1 to 10 and provided that he had
some concentration problems.  (Tr. 459).  Ms. Michals described his affect as appropriate and his
mood as depressed, but mild.  (Tr. 460).  She found his thought processes logical and goal
oriented.  (Tr. 460).  She also noted that Plaintiff was "responding well with [his] current
medication regime."  (Tr. 461).  On Jan 22, 2008, she noted that Plaintiff's affect was
appropriate, but constricted, his mood was depressed, but mild-moderate, and his thought
processes were logical and goal-oriented.  (Tr. 602).  She noticed no major memory deficits and
assigned him a GAF score of 60.  (Tr. 601).  She made similar findings and assigned him the
same GAF score on April 22, 2008.  (Tr. 585-87).  Indeed, throughout her course of treatment,
she continually noted that Plaintiff himself ranked his depression symptoms, anxiety, energy
level, and concentration in the range of 4 through 6 on a scale of 0 to 10.  (Tr. 459-60, 583, 597-
99, 1207-09, 1216-18, 1224-26).  He also denied any suicidal or homicidal ideations or plans.
(Id.)  She continually rated his overall affect as constricted, but moderate, and his mood as
depressed, but moderate.  (Id.)  She found that his thought processes were logical and goal
oriented and noted no impairments to insight, judgment, or attention; instead finding that they
were adequate for daily living.  (Id.)  At times she even noted that his affect was in full-range
and appropriate and his depression was more mild.  (Tr. 1208).  At times, he even noted his
anxiety and depression symptoms as low as 2.  (Tr. 599).

Additionally, Plaintiff underwent regular therapy sessions with Danny L. Correll, MSW,
LCSW.  Mr. Correll worked with Plaintiff to identify triggers that caused his anxiety and

depression and set up goals for Plaintiff to improve on his ability to deal with his depression and anxiety. During Plaintiff's first session on June 4, 2007, Mr. Correll noted that Plaintiff was dressed appropriately, showed mild anxiety, some notable attention problems, but made no somatic complaints. (Tr. 617). Plaintiff also reported feelings of isolation. (Tr. 617). On August 1, 2007, Mr. Correll noted that Plaintiff reported being at a better baseline and provided that "the medication seems to be helping [with] the anger outbursts." (Tr. 615). Mr. Correll continually noted that although Plaintiff appeared tired and quiet at times, he presented well and made improvements on his goals. (Tr. 614, 663, 680, 1214, 1222). In September of 2007, Mr. Correll assigned Plaintiff a GAF score of 60 and noted only moderate stressors. (Tr. 606).

In June of 2008, Mr. Correll again assigned Plaintiff a GAF score of 60. (Tr. 678). On October 1, 2008, he assigned Plaintiff a GAF score of 63. (Tr. 1214). On November 21, 2008, he noted that Plaintiff's affect is mildly constricted, but appropriate. (Tr. 1205). This is in accordance with his usual mild disturbance findings. (Tr. 680, 1183). On January 6, 2009, he again assigned Plaintiff a GAF score of 63 and when Mr. Correll asked if Plaintiff found he was making progress, Plaintiff replied "[t]his stuff is helping make sense of stuff; feel like were in the right direction." (Tr. 1202-04). Plaintiff also noted that if it "wasn't for meds [he'd] really be climbing the walls; trying to get out more and be [with] the neighbor; not as bad as it was." (Tr. 1202).[5]

At the hearing, Steven Carter, Psy. D, testified as the medical expert. (Tr. 42). Dr. Carter provided that based on his review of the medical evidence, listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.09 (Substance Addiction Disorders) were the most

---

[5] In addition to his mental health impairments, Plaintiff previously had some surgeries to remove a gall bladder and repair a hernia, but he stated that they do not provide any limitations. (Tr. 33). Plaintiff also has diminished hearing and uses hearing aids. (Tr. 32-33). Additionally, he suffers from eczema, which flares up on his skin and causes a rash when has been out in the heat. (Tr. 35). However, by wearing long-sleeves, he is able to avoid the symptoms. (Tr. 35).

appropriate listings in considering whether Plaintiff's impairments met or equaled any of the

listed impairments.  (Tr. 42).  Before providing his medical opinion regarding Plaintiff's

impairments, Dr. Carter noted that on several occasions in the record, he would find diagnosis by

treating physicians that, in Dr. Carter's opinion, were not consistent with the treating physician's

notes for that particular session.  (Tr. 42).  As an example, Dr. Carter described the physician's

notes and GAF score of 60 assigned to Plaintiff on June 5, 2008.  (Tr. 42).  Dr. Carter believed

that the GAF score was too high because in Dr. Carter's opinion, "the Social worker seem[ed] to

be documenting functioning worse than that."  (Tr. 43).  Dr. Carter also opined that Plaintiff was

given a GAF score of 44 on June 28, 2006, but in Dr. Carter's opinion this GAF score was too

low for the reported mild symptoms demonstrated by Plaintiff on that visit.  (Tr. 43).

Regarding "paragraph A" criteria of the 12.04 listing, Dr. Carter cited to evidence in the

record demonstrating anhedonia, appetite disturbance, sleep disturbances, psychomotor

retardation, difficulty concentrating or thinking, and thoughts of suicide.  (Tr. 44).  Based on this

evidence in the record, Dr. Carter opined that Plaintiff met criterion A.  (Tr. 44).  He also opined

that the criterion A for listing 12.06 was also satisfied.  (Tr. 45).  In reference to "paragraph B"

criteria for listings 12.04 and 12.06, Dr. Carter opined that Plaintiff had mild restriction of

activities in daily living based on the nature of Plaintiff's activities.  (Tr. 45).  In evaluating

Plaintiff's difficulties in maintaining social functioning, Dr. Carter opined that they were

marked, relying on Plaintiff's comments that he liked to be in the woods by himself and that he

did not like sitting with his co-workers when he was on a construction job.  (Tr. 46).  However,

Dr. Carter acknowledged some contrary evidence, such as Plaintiff's ability to attend AA

meetings and go to church.  (Tr. 46).  For Plaintiff's difficulties in maintaining concentration,

persistence, or pace, Dr. Carter again found marked limitations.  (Tr. 46).  Dr. Carter explained

that the medical tests demonstrated that Plaintiff had good concentration, but describing

Plaintiff's accounts of distraction at work, Dr. Carter opined that Plaintiff "can't keep it up."  (Tr.

46-47).  In Dr. Carter's opinion, Plaintiff's comments about difficulties at work were sincere, and

Dr. Carter believed that Plaintiff would "do well on brief psychiatric and psychological tests[,

b]ut when it comes to sustaining and persisting over the course of a workday," Dr. Carter did not

believe that Plaintiff could "hold it together."  (Tr. 47).  Regarding, episodes of decompensation,

Dr. Carter found none.  (Tr. 47).  He also found that there was insufficient evidence to satisfy

"paragraph C" criteria.  (Tr. 47).  In summary, Dr. Carter found that Plaintiff met the "paragraph

A" criteria for both 12.04 and 12.06 and that Plaintiff also had marked limitations in two of the

categories for "paragraph B criteria."  (Tr. 48).

Dr. Carter then also provided some job restrictions, regarding Plaintiff's ability to work.

(Tr. 47).  Dr. Carter opined that Plaintiff "would need very brief and superficial contact with co-

workers and supervisors," that Plaintiff would not work well as part of a team, that there should

be no crowds at Plaintiff's workplace, that Plaintiff not work directly with the public or

customers, and that there not be "unexpected loud noises" at Plaintiff's workplace.  (Tr. 47).

Furthermore, although Plaintiff needed a consistent routine, it did not have to be simple but

could be moderately complex.  (Tr. 48).  In his concluding remarks, although Dr. Carter again

reaffirmed that he believed Plaintiff met the listings, he opined that Plaintiff continued to show

improvement and that Plaintiff may no longer meet the listing in "another couple years."  (Tr.

49).

### D.  Evidence from the Vocational Expert

Vocational expert, Mary Harris, testified at the administrative hearing regarding what

jobs exist in the region and whether Plaintiff would be suitable for any such jobs.  (Tr. 49-56).

The ALJ framed a hypothetical person and asked whether such a person could either perform Plaintiff's past relevant work or some other work available in the economy. The hypothetical person he described was an individual between the ages of 53 and 56, with the same educational and vocational background as Plaintiff, impaired by Post Traumatic Stress Disorder "and Depression, that's been characterized as Major Depressive Disorder and Anxiety with different labels for that set of symptoms." (Tr. 51). The ALJ further restricted the person to someone who suffers from hearing loss, some non-severe right and left inguinal hernia repair, some low-back pain, degenerative disk disease, and eczema. (Tr. 51). Further limitations included cholecystectomy and a left knee injury. (Tr. 51). Next, the ALJ provided that there must only be very brief superficial contacts with co-workers, where work with crowds or the public is not part of the job task, and the hypothetical person must not be subjected to unexpected loud noises, that would startle him. (Tr. 51-52). Finally, the ALJ instructed that the hypothetical person could only do simple unskilled work and would be situated for a consistent multi-step routine. (Tr. 52). Ms. Harris testified that such a person could still perform parts of the construction work that Plaintiff had previously done. (Tr. 52). Particularly, she provided that similar construction jobs are available where the person goes to do the work individually in the kind of "construction self-employment he's been doing." (Tr. 52).

The ALJ then limited the hypothetical person further to someone who could use hearing protection and wouldn't be exposed to chemicals on his hands as part of the job, or at least would be allowed to use gloves as a protective measure when dealing with chemicals. (Tr. 53). The vocational expert testified that jobs in the same field—such as constructing with wood—would not involve chemicals. (Tr. 53). The ALJ then provided another restriction: no exposure to extreme temperature, specifically heat on a prolonged basis. (Tr. 53). Ms. Harris stated that

such a restriction—essentially for inside work only—would reduce the numbers of jobs available within the region from 50,000 jobs in the area of construction generally to approximately 5,000. (Tr. 53).  Finally, the ALJ asked whether any jobs were available if the hypothetical person "could only do routine, repetitive, three to four-step tasks and instruction" only with brief and superficial contact with workers and brief, infrequent, superficial contact with the public.  (Tr. 53).  The vocational expert explained that this would further reduce the numbers to approximately 1,500 jobs.  (Tr. 53-54).

Plaintiff's counsel then questioned Ms. Harris whether, even on an inside, one-person construction site, there would be a possibility for unexpected loud noises such as when something falls or breaks.  (Tr. 54).  Ms. Harris responded that this would be true for any workplace and that focusing on the unexpected element, as the medical expert had testified when giving his limitation, it is unlikely that there would be many because the hypothetical person would be the only person on the job.  (Tr. 55).  In response, Plaintiff's counsel gave as an example a situation where even a person working within their home would "set something down wrong" such that all of a sudden it would make a noise, and asked whether this wouldn't be more likely to occur at a construction site.  (Tr. 55).  The vocational expert again provided that she was not referring to construction sites per se, as in big construction sites.  (Tr. 56).

### E.  The ALJ's Decision

The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 19).  In reaching his decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient RFC to return to her past

work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  (Tr. 10-12); 20 C.F.R. § 404.1520(a)-(f).

At step one of the analysis, the ALJ determined that Plaintiff had not engaged in substantial work from the onset date of his alleged disability.  (Tr. 12).  Next, in analyzing step two, the ALJ found that Plaintiff had the following severe impairments: "major depression in partial remission and anxiety and a history of alcohol dependence in long term sustained remission."  (Tr. 12).  Because Plaintiff's physical impairments caused only minimal impact on the claimant's ability to perform work, the ALJ found that Plaintiff had no severe physical impairments that would impact his ability to work.  (Tr. 13).  The ALJ explained that Plaintiff's eczema was controlled by wearing long sleeves when hot outside and successfully managed by medications.  (Tr. 13).  Regarding Plaintiff's hearing, the ALJ expounded that even without hearing aids, Plaintiff could hear at an 86% level and hearing aids restored his hearing.  (Tr. 13).  In reference to Plaintiff's hernia and cholestectomy, the ALJ found that they posed no work limitations at all.  (Tr. 13).  The ALJ also noted that Plaintiff had been "successfully treated for high cholesterol and hypertension with medication with no adverse work side-effects."  (Tr. 13).

At step three, the ALJ decided that Plaintiff did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1.  (Tr. 13).  Specifically, the ALJ considered the criteria of listings 12.04, 12.06 and 12.09.  (Tr. 13).  After explaining the requirements necessary to satisfy "paragraph B criteria," the ALJ found that the Plaintiff had: (1) mild restriction in activities in daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties with regard to concentration, persistence, or pace; and (4) no episodes of decompensation that have been for an extended duration.  (Tr. 14).  Because the ALJ did not find "two marked limitations [n]or one marked

limitation and repeated episodes of decompensation, each of extended duration," he held that the "paragraph B criteria" was not satisfied.  (Tr. 14).  Additionally, he found that the evidence does not establish the "paragraph C" criteria.  (Tr. 14).

Then, at step four of the analysis, the ALJ concluded that Plaintiff had the "residual functional capacity [RFC] to perform a full range of work at all exertional levels but with the following non-exertional limitations: routine repetitive 3-4 step tasks and instructions with brief and superficial contact with co-workers brief and infrequent contact with the public."  (Tr. 14).

In making this RFC determination, the ALJ employed a two-step process.  (Tr. 14).  First, the ALJ asked whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. (Tr. 15).  Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms was shown, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limited the claimant's ability to work.  (Tr. 15).  If objective medical evidence did not substantiate the claimant's statements about intensity, persistence or symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of her impairments by considering the record as a whole.  (Tr. 15).  Furthermore, in making his determination, the ALJ considered all of Plaintiff's alleged symptoms and whether they were consistent with the objective medical evidence and other evidence consistent with 20 C.F.R. 404.1529, (Tr. 14), and also considered opinion evidence in accordance with 20 C.F.R. 404.1527.  (Tr. 14-15).

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms.  (Tr. 15).  However, at the second prong, the ALJ determined the claimant's statements concerning

the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (Tr. 15).

The ALJ found that "residual functional capacity [assessment] fully accommodates the limitations and the credible degree pain or precipitating and aggravating factors that arise from the claimant's severe impairments and that affect his ability to perform work." (Tr. 15). The ALJ explained that Plaintiff did not have any severe physical impairments and was limited, primarily, by mental limitations. (Tr. 15). However, he noted that Plaintiff's "depression [was] in remission and he remain[ed] clean and sober since May [of] 2007." (Tr. 18). He also noted that Plaintiff's treatment was conservative and generally successful. (Tr. 18). Citing Plaintiff's statements to Dr. Robert Hoffman, the ALJ found that Plaintiff was "able to manage his self-care, household chores and meal preparation," and further describing Plaintiff's various daily activities, the ALJ determined that "[t]he wide range of activities that [Plaintiff] reported to Dr. Hoffman does not support disability. (Tr. 17). In particular, the ALJ focused on Plaintiff's ability to mow the lawn, go camping, cook, "tinker" with things, watch television, shovel snow, keep his room tidy, shop for groceries, do laundry, seeing a girlfriend about three times a week (prior to his second marriage), and going to church. (Tr. 17). He found such activities to demonstrate "a full range of activities of daily living." (Tr. 18). Additionally, in making his credibility determination, the ALJ noted that Plaintiff's continued drinking after treatment, on prior occasions, did not bolster his credibility. (Tr. 16).

The ALJ also explained that he reduced the RFC assessment "to accommodate the moderate difficulties maintaining social functioning and concentration, persistence and pace with routine repetitive 3-4 step tasks and instructions with brief and superficial contact with co-workers brief and infrequent contact with the public." (Tr. 17).

In citing and explaining Plaintiff's VA medical records, the ALJ referred, in detail, to Plaintiff's VA records from 2004 to 2008 and cited specific findings by Plaintiff's social worker, Patricia Michals, and Denny Correll.  (Tr. 17-18).  These records, according to the ALJ, revealed that Plaintiff had a long history of depression that exacerbated at times in his life, but that Plaintiff had good insight and judgment, normal speech and thought processes, no memory deficits, and that Plaintiff communicated well and reported improvement with medications.  (Tr. 17).  Although the ALJ explained that the VA had found Plaintiff disabled to a certain level, he asserted that he was not bound by the VA's disability determinations because "[t]he disability program requirements under Social Security are different than the requirements under the Veteran's Administration."  (Tr. 18).

Regarding Plaintiff's work history, the ALJ provided that Plaintiff had a steady work history, and had performed several part-time jobs, but also noted that because Plaintiff retired from his previous work, rather than quitting because of disability, and because Plaintiff already receives almost $2,000 in VA benefits and state retirement benefits, Plaintiff "may not be motivated to find employment."  (Tr. 18).

Although the ALJ cited to, and relied on, many of Dr. Hoffman's findings, the ALJ rejected Dr. Hoffman's specific opinion that Plaintiff "would not tolerate a normal amount of stress in the workplace" because Dr. Hoffman's opinion was not supported by Plaintiff's ability to do carpentry and household chores."  (Tr. 17).  Overall, the ALJ was not persuaded that Plaintiff was unable to work full-time or at sustained gainful levels because Plaintiff had "shown an ability to work since the date of onset, he [was] stable with his current treatment and his daily activities [were] inconsistent with total disability and the objective medical evidence [did] not support a finding of disability."  (Tr. 18).

Still under step four of the analysis, the ALJ determined that Plaintiff is able to perform his past relevant work as a construction worker because it did not "require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity." (Tr. 19).  The ALJ explained that "the impartial vocational expert's description of [] jobs is consistent with the descriptions set forth in the Dictionary of Occupational Titles" and that he found the vocational expert's opinion "credible and persuasive, as it [was] well-supported and based on professional experience." (Tr. 19).  Because the ALJ held that Plaintiff was capable of performing his past relevant work, he did not reach step five of the analysis.  As such, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 19).

## II.      STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits.  There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401 et seq.).  "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be eligible for benefits, an individual's impairments must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence means more than a scintilla, but less than a preponderance.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir.

2009).  The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195 1199 (8th Cir. 1987)).  Rather, the court "must take into account whatever in the record fairly detracts from its weight."  Id.  (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion.  Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'"  Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).  The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact."  Id.

## III.    DISCUSSION

Plaintiff raises three distinct issues before the Court:  (1) "Is there substantial evidence in the record, as a whole, to support the [ALJ's] finding that [Plaintiff] did not have a listed impairment";  (2) "Is there substantial evidence in the record, as a whole, to support the [ALJ's]

finding that [Plaintiff] is capable of performing other work that exist in significant numbers in the national economy"; and (3) "Did the Appeals Council err in failing to include updated VA records in their review."  (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. [Docket No. 7] at 12).  In response, Defendant argues that (1) substantial evidence supports the ALJ's finding that none of Plaintiff's impairments met the criteria of the listings; (2) substantial evidence supports the ALJ's decision that Plaintiff retained the capacity to perform his past relevant work; and (3) the medical evidence submitted to the Court after the ALJ's decision does not undermine the ALJ's decision.  (Def.'s Mem. in Supp. of Mot. for Summ. J [Docket No. 15] at 13-22).[6]

## A. Substantial Evidence in the Record as a Whole Supports the ALJ's finding that Plaintiff did not have a Listed Impairment

Plaintiff challenges the ALJ's conclusion that Plaintiff did not have a listed impairment on several separate arguments.

First, Plaintiff argues that the ALJ reached his finding without an explanation or reasoning as to why he reached that conclusion.  (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J at 6).  Looking at the ALJ's finding in that section, in isolation, it is true that the ALJ only

---

[6] Defendant also argues that substantial evidence supports the ALJ's RFC finding.  (Def.'s Mem. in Supp. of Mot. for Summ. J. [Docket No. 15] at 16-19).  However, the Plaintiff did not raise this as an issue in the list of issues clearly presented in Plaintiff's brief.  (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. [Docket No. 7] at 12). Indeed, after laying out the five-step analysis performed by the ALJ, Plaintiff provides that the "dispute is whether or not Mr. Laveau has a listed impairment and whether Mr. Laveau is capable of performing his past work or other work existing in significant numbers in the national economy."  (Id. at 13). In the analysis section of his brief, Plaintiff provides no point headings whatsoever to direct the Court as to which issue Plaintiff makes his stated arguments.  Moreover, although two of the issues raised by Plaintiff argue that the ALJ's decisions are not supported by substantial evidence, in his analysis section, Plaintiff provides zero (0) citations to the record in support of his argument.  Although in his brief Plaintiff may appear to make arguments that could also apply to the ALJ's RFC finding (or ALJ's decision to discount Dr. Carter's opinion), the Court will not treat every plausible argument as a newly raised issue.  (See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 17) (stating in a conclusory fashion that the ALJ "rejected the medical evidence in adopting a residual functional capacity that is contrary to reality and the facts.").  Though the Court reads a pro se party's pleadings liberally, no such mandate exists for represented parties, as Plaintiff is in this case.  Therefore, the Court will address only the issues squarely raised, and argued, by Plaintiff before the Court without developing Plaintiff's arguments mentioned in a conclusory fashion.  All other issues, the Court considers abandoned.  See Hacker v. Barnhart, 459 F.3d 934, 937 n.2 (8th Cir. 2006) (denying a challenge to the ALJ's decision to discount a medical opinion because "[a] party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue").

provided a bullet-point list of findings regarding each one of the "paragraph B" criteria, without providing detailed explanations, in that particular section.  However, reading the ALJ's opinion as a whole, the Court finds that the ALJ provided support for his conclusions.  See Lewis-Leavy v. Barnhart, 109 Fed. Appx. 815, at *1 (8th Cir. 2004) (unpublished) ("reading the ALJ's opinion as a whole, we find that he made the requisite findings").  In the section immediately prior to the one at issue, the ALJ fully explained his reasoning for discrediting Dr. Carter's opinion that Plaintiff's impairments met or equaled a listed impairment.[7]  The ALJ provided further analysis regarding Plaintiff's social functioning, concentration, persistence, and pace in his RFC analysis. Although, certainly, it would have been preferable that the ALJ also provide more detailed explanations after each "paragraph B" criteria finding and also provide citation to the record, his failure to do so does not require a remand.  See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) ("[Plaintiff] is correct that it is preferable to have the Commissioner explicitly state the reasons why a claimant failed to meet a listing, but the conclusion may be upheld if the record supports it."); see also Carrington v. Astrue, No. 2:07cv967, 2008 WL 4462257, at *8 (W.D. Pa. Sept. 29, 2008) (explaining that the Court does not read the ALJ's findings "in a vacuum" and "[a]lthough the analysis of the medical evidence appears in places in the decision other than under the step three finding, the Court recognizes that it applies with equal force to that section.").

The Court is aware that the the Third and Tenth Circuits have each held that an ALJ must set out his reasons for making a determination at step three of the analysis and cannot merely

---

[7] The ALJ's analysis of Dr. Carter's opinion was in the section regarding whether Plaintiff had a severe impairment, not whether his impairments met or equaled the listed impairments.  However, in his explanation of Dr. Carter's opinion, the ALJ stated "[t]he fact that Dr. Carter concluded that the claimant retained an ability to perform work tasks, **does not support a listing level impairment**."  (Tr. 13).  Thus, it appears that the absence of an analysis, where Plaintiff argues there should be one, may merely be a clerical error of placing the analysis in the wrong section.

make conclusory remarks.  See Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996)

(remanding the case because "the ALJ did not discuss the evidence or his reasons for

determining that appellant was not disabled at step three, or even identify the relevant Listing or

Listings; he merely stated a summary conclusion that appellant's impairments did not meet or

equal any Listed Impairment."); Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, (3d Cir.

2000) (citing Clifton and explaining that the "ALJ's conclusory statement in this case is similarly

beyond meaningful judicial review").  However, the Eighth Circuit has explicitly rejected the

holding in Clifton.  See Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (citing Clifton and

explaining that "this is not the rule in the Eighth Circuit" and that the Eighth Circuit has

"consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside

an administrative finding where the deficiency had no practical effect on the outcome of the

case").  Therefore, even if the ALJ's finding was conclusory, and not supported by his written

analysis read as a whole, which is not the case now before the court, if substantial evidence in the

record supports his finding, which the Court finds that it does, this Court will not, under Senne,

remand the ALJ's decision for that reason alone.

  Second, Plaintiff argues that the ALJ's finding directly conflicts with the opinion of Dr.

Carter, the medical expert at the hearing.[8]  Although Plaintiff argues that "[t]he ALJ rejected Dr.

Carter's opinion without explanation," this is simply untrue.  In a detailed paragraph, among

other references in his opinion, the ALJ explained his specific reasons for affording Dr. Carter's

opinion no weight.  First, the ALJ gave no controlling weight to Dr. Carter's opinion because the

record did not support "marked limitations in any domain of functioning for the requisite period

---

[8] Importantly, Plaintiff does not argue that Dr. Carter's opinion should have been afforded controlling weight.
Rather, he argues that the ALJ's finding is not supported by substantial evidence.  Although at first glance the
arguments appear related, and may overlap to a certain extent, because the weight afforded to a physician's opinion
is a separate legal question from whether substantial evidence supports the ALJ's finding, the Court will address
only the argument directly made by the Plaintiff.

of at least 12 months." (Tr. 13). Second, the ALJ gave no weight to the opinion because

medication and a reduction in alcohol consumption demonstrated improvement in Plaintiff's

impairments. (Tr. 13). Third, Dr. Carter's opinion was given no weight because Plaintiff

retained the ability to perform work that was limited to brief, superficial contact with co-workers

and without unexpected loud noises, which was inconsistent with a finding of disability. (Tr.

13). Furthermore, the Court notes that there is no evidence in the record that Dr. Carter was the

treating physician for Plaintiff at any time nor is there any evidence in the record that Dr. Carter

personally examined Plaintiff. Indeed, it appears that Dr. Carter's primary reasoning is based on

Plaintiff's subjective complaints and statements regarding his experience at previous jobs. The

ALJ may appropriately give little weight even to a treating physician's opinion when it rests

solely on the claimant's complaints and is unsupported by objective medical evidence. Woolf, 3

F.3d at 1214. Although Dr. Carter expressed an opinion that the treating physician's medical

conclusions were not as severe as they should have been, given the described symptoms, his

opinion regarding other medical opinions is not determinative. "It is the ALJ's function to

resolve conflicts among the various treating and examining physicians." Bentley v. Shalala, 52

F.3d 784, 785 (8th Cir. 1995). In summary, the Court concludes that Dr. Carter's opinion was

not binding on the ALJ.[9]

   Third, Plaintiff argues that "the ALJ certainly did reach conclusions based upon

nothing." (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 19). The crux of Plaintiff's

argument is that the ALJ's finding of moderate difficulties in the "paragraph B" criteria of social

---

[9] Plaintiff also appears to argue that if the ALJ gave "no weight" to Dr. Carter's opinion, then the ALJ could not have used Dr. Carter's findings in determining part of Dr. Hoffman's opinion to be "inconsistent." Plaintiff cites no cases for this proposition. In making determinations regarding a medical opinion, the ALJ considers, analyzes, and evaluates all of the medical opinions in the record. See Norris v. Astrue, 374 Fed. Appx. 675, at *1 (8th Cir. 2010) (unpublished) ("ALJ must consider all relevant evidence, including medical records, observations of treating physicians, and others, and claimant's own description of [his] limitations."). Although the ALJ may find certain conclusions by a physician to be unsupported by the evidence, and therefore afford them no weight or little weight, nothing requires the ALJ to erase all other observations or conclusions made by that particular physician.

functioning and concentration, persistence, or pace, as opposed to Dr. Carter's finding of marked

difficulties, is not supported by the evidence. The Court disagrees and finds that the ALJ's

findings are supported by substantial evidence in the record. Additionally, the Court notes that

aside from Plaintiff's arguments regarding Dr. Carter's opinion, Plaintiff provided zero (0)

citations to the evidence in the record that would undermine the ALJ's findings.

Regarding social functioning, although the record reflects Plaintiff's claims that he felt

uncomfortable socializing with his co-workers and at times he wanted to be alone, the record

also reflects that Plaintiff was able to function at a level of social interaction that supports a

moderate, not marked level of difficulties. Plaintiff noted on several occasions that he finds

others help him become motivated to do activities, and he enjoys doing them. (Tr. 1168).

Plaintiff was able to continue a successful relationship with his sons, whom he talked to

everyday. (Tr. 382, 589). For some of the time of his alleged disability, he was able to go to

church and his AA meetings. (Tr. 46, 611, 614, 617). His treating physicians characterized him

as pleasant and made no findings that he was unable to interact with them. (Tr. 399, 617). He

was also able to, after his divorce, not only find a person he enjoyed spending time with, but also

build a relationship such that he remarried within a year of his divorce. Even Dr. Carter admitted

that "[t]here is evidence contrary to [his] conclusion." (Tr. 46). The record as a whole, provides

substantial evidence to support the ALJ's finding on Plaintiff's level of social functioning.

Regarding concentration, persistence, or pace, Plaintiff's treating physicians continually

made mild, or only moderate findings on Plaintiff's concentration and depression symptoms.

(Tr. 361-62, 382-83, 378, 396-97, 459-60, 583, 588-89, 597-99, 1169-72, 1207-09, 1216-18,

1224-26). These consistent evaluations of Plaintiff's symptoms support the ALJ's decision.

Indeed, the evidence that Dr. Carter cites in support of his marked concentration suggests

moderate difficulties, rather than marked.  (See Tr. 644) ("Concentration: adequate for daily living. Sometimes can stay focused and other times does not.").  Plaintiff demonstrated normal results on concentration evaluations, sometimes even better than expected for someone with his mental health impairments.  (Tr. 348, 396-97, 1169).  Even when Plaintiff made subjective complaints of concentration to his treating physicians, he characterized it as moderate and rated it between 4 and 6 (on a scale of 0-10).  (Tr. 459-60, 583, 588-89, 597-99, 1168, 1207-09, 1216-18, 1224-26).  Furthermore, the state agency consultant also found that Plaintiff only had mild to moderate limitations in concentration and social interaction.  (Tr. 365-66).  The Court finds that substantial evidence in the record as a whole supports the ALJ's finding on this issue as well.

Finally, Plaintiff argues that the ALJ "erred by failing to fully consider the decision of the [VA] that [Plaintiff] was disabled."  (Pl.'s Mem. of Law in Supp. of Summ. J at 17).  However, as Plaintiff acknowledges, the Commissioner is not bound by the disability determination of another agency.  See 20 C.F.R. § 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."); Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996) ("This court has held that a disability determination by the Veterans Administration is not binding on the ALJ.").  "The ALJ should consider the VA's finding of disability, but the ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits."  Pelkey v. Barnhart, 433 F.3d 575, 579-80 (8th Cir. 2006) (internal citations omitted).  Where the ALJ "fully consider[s] the evidence underlying the VA's final conclusion that" Plaintiff was disabled and he mentions the

treatment records, the ALJ does not err.  Id.  In this case, the ALJ considered and discussed the medical evidence underlying the VA's determination.  (Tr. 15-16).  The ALJ also even referenced the VA's disability determination, but stated that he is not bound by the standers set by the VA.  As such, the ALJ committed no reversible error.

For the reasons stated above the Court finds that substantial evidence in the record as a whole supports the ALJ's finding that Plaintiff's impairments did not meet or equal the listed impairments.[10]

**B.  Substantial Evidence in the Record as a Whole Supports the ALJ's Finding that Plaintiff Could Perform his Past Relevant Work**

The ALJ determined that Plaintiff is able to perform his past relevant work as a construction worker because such work did not "require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity."  (Tr. 19).  The ALJ explained that "the impartial vocational expert's description of [] jobs is consistent with the descriptions set forth in the Dictionary of Occupational Titles" and that he found the vocational expert's opinion "credible and persuasive, as it [was] well-supported and based on professional experience."  (Tr. 19).

Although in his statement of issues Plaintiff explicitly listed the question of whether "substantial evidence in the record, as a whole, [supports] the [ALJ's] finding that [Plaintiff] is capable of performing other work that exist[s] in significant numbers in the national economy,"

_____

[10] The Court also notes the inappropriate nature of Plaintiff's counsel's accusatory remarks—without any support—that "this particular[] ALJ almost always denies claims of claimants who have had a past history of substance abuse, no matter how remote in history and no matter whether in remission or not."  (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 6); (see also id. at 7) ("Historically this particular ALJ denies every claim where a person has had, at any point in their life, a chemical dependency issue, whether it be material or not.").  Though Plaintiff's arguments, to the extent they question the ALJ's reliance on the alcohol symptoms described in this case specifically, may be appropriate, his general remarks about the ALJ have no place in the filings to the Court based on the issues raised. Additionally, to the extent Plaintiff challenges the ALJ's discussion of Plaintiff's alcohol consumption, such a discussion was relevant in light of the evidence in the record demonstrating that it purportedly affected Plaintiff's depression.  (Tr. 611).

Plaintiff's only direct arguments regarding this issue in the Analysis section of his brief is that

"the ALJ found that hit or miss odd jobs were actual real jobs that existed in the national

economy." (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 20). Plaintiff, in his statement

of facts, after describing the vocational expert's testimony, asserts that "[a]dmittely[,] she was

not 'pressed' very hard on cross[-]examination[, b]ut it sounds like these aren't necessarily real

jobs," referring to the vocational expert's testimony that Plaintiff could perform unskilled, one-

person, indoor, construction jobs. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 10). He

does not directly challenge the hypothetical question the ALJ posed to the vocational expert.[11]

In determining that Plaintiff could return to his past relevant work, the ALJ is not

necessarily making a conclusion that Plaintiff can return to his previous position specifically, but

rather to a position with similar responsibility. See 20 C.F.R. § 404.1560(b)(2) ("A vocational

expert or specialist may offer relevant evidence within his or her expertise or knowledge

concerning the physical and mental demands of a claimant's past relevant work, either as the

claimant actually performed it **or** as generally performed in the national economy."); Martin v.

Sullivan, 901 F.2d 650, 652-53 (8th Cir. 1990) (explaining that the test under the statute is

"clearly meant to be disjunctive" and "[i]f the claimant is found to satisfy either test, then a

---

[11] Defendant addresses such an argument because it believes that Plaintiff may have "suggested" it by arguing that the ALJ should have given weight to restrictions based on hearing loss and eczema. (Def.'s Mem. in Supp. of Mot. for Summ. J. 20). Reading the portion of Plaintiff's brief that Defendant cites, the Court does not believe that it raises a plausible argument regarding the hypothetical questions posed to the vocational expert by the ALJ; rather that portion of Plaintiff's brief appears to argue that the ALJ failed to ask Plaintiff himself about his eczema and mental health. (Pl.'s Mem of Law in Supp. of Mot. for Summ. J. at 19). However, to the extent that Plaintiff challenges the hypothetical question, the argument fails. The ALJ initially posed a hypothetical person who suffered from Plaintiff's severe impairments including major depressive disorder and anxiety, in addition to some hearing loss that requires him to wear hearing aids and some other physical limitations. The vocational expert testified that the hypothetical person could continue to perform Plaintiff's past relevant work. The ALJ then added a second and third restriction regarding Plaintiff's eczema, even though the ALJ found it not to be a severe impairment, and the vocational expert testified that even with such restrictions, the hypothetical person could perform Plaintiff's past relevant work. "The ALJ's hypothetical question needs to 'include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" Roe, 92 F.3d at 675 (quoting Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996)). Plaintiff fails to describe which, if any, instruction was in error, or which impairment that was supported by substantial evidence in the record the ALJ failed to include in his hypothetical question. The Court finds that the ALJ committed no error in the hypothetical questions he posed to the vocational expert.

finding of not disabled is appropriate").  "Testimony from a vocational expert based on a

properly-phrased hypothetical constitutes substantial evidence."  Howard v. Massanari, 255 F.3d

577, 582 (8th Cir. 2001); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

In this case, after posing the first hypothetical question, the ALJ continued to add further

limitations to the hypothetical person, and each time, he then asked the vocational expert

whether, in light of those added limitations, the hypothetical person could still perform any of

Plaintiff's past jobs?  At each further limitation, the vocational expert testified that the

hypothetical person could continue to perform variations of the construction work previously

performed by Plaintiff.  Although the vocational expert could not be precisely specific regarding

the exact construction titles that applied, given the breadth of diverse construction work available

within each construction contract, and Plaintiff's varied construction work in the past, the

vocational expert's testimony is sufficient to find that construction work existed, in the national

economy, under which the hypothetical person described by the ALJ could perform the work.

The considered weight of the vocational expert's opinion is further demonstrated by her

reduction of the number of available jobs after each added limitation by the ALJ to the

hypothetical and her specific focus on the element regarding the unexpected noise restriction.

Other than Plaintiff's counsel's conclusory assertion that the vocational expert's definition of

construction work "sound like these aren't necessarily real jobs," Plaintiff has offered no

evidence in the record to rebut the vocational expert's testimony, which would itself constitute

substantial evidence in the record.  See Howard, 255 F.3d at 582.

For these reasons, the Court finds that the ALJ's finding is supported by substantial

evidence in the record as a whole.

**C. The Additional Medical Evidence Submitted to the Appeals Council does not Undermine the ALJ's Decision**

On November 18, 2010, Plaintiff's counsel submitted VA records, in addition to other medical records, to the Appeals Council, which were not previously presented to the ALJ. (Aff. of Sean Quinn ¶ 4). Plaintiff argues that although the Appeals Council record included Documents 5 through 8 submitted late by Plaintiff's counsel, because of an alleged clerical error the Appeals Council failed to physically include the VA records as part of the administrative record in this case. (Id. ¶¶ 6-7). Plaintiff does not challenge the Appeals Council's determination regarding evidence it considered. Rather, Plaintiff argues that the Appeals Council's alleged failure to include the VA records constitutes a reversible error. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J [Docket No. 7] at 12).

Plaintiff now submits these VA documents to the Court not "for the purpose of proof of [Plaintiff's] claim" but "for the purpose of proof that there were additional relevant documents that were submitted to the Appeals Council and should have been considered for review." (Aff. of Sean Quinn ¶ 11). He argues that because "decisions of the Veteran's Administration, while not controlling, should be at least given some consideration and weight," the Appeals Council erred by not explicitly stating that they considered the VA records. The Court disagrees.

The regulations provide the standard for when the Appeals Council must consider newly submitted medical evidence:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).[12]

First, the Court notes that the VA records submitted by Plaintiff's counsel consist, primarily, of administrative letters explaining the VA's disability process to Plaintiff.  (See Aff. of Sean Quinn at 10-23, 25-28).  Such information is neither new nor would it be material to the ALJ's disability determination.

The only relevant late submitted document appears to be a three page letter (the VA letter), in which the VA provided the reasons for its decision and a reference to the medical evidence on which it relied to increase Plaintiff's rate of service connected disability to 100%. (Id. at 30-33).  Although the VA considered evidence such as letters from the VA to Plaintiff and letters from Plaintiff to the VA, the only medical evidence that the VA appears to have considered, and which it described in its analysis, is a VA examination dated March 17, 2009. (Id. at 30).  Though the medical records of the actual examination were not provided to either the Appeals Council or this Court, the VA letter states that the March 17, 2009 examination gave Plaintiff a GAF score of 50 and provides no further detail regarding the physician's findings. (Id. at 31).  Under the VA disability standards, the VA considered Plaintiff entitled to the 100% rate of service connected disability effective May 28, 2008 (the date of his Application for Increased Compensation), rather than the 80% disability rate previously determined by the VA. (Id. 29, 32).  The VA concluded that Plaintiff is "no longer capable of maintaining gainful

---

[12] Although Plaintiff appears to argue that "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration issues," (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 16) (quoting SSR 06-3p), this standard applies to the determination made by the adjudicator (the ALJ).  Because the evidence was not yet available at the time of the ALJ's decision, it was not possible for him to consider it.  Plaintiff, appropriately, does not argue that the ALJ must have considered the evidence but argues that the Appeals Council was required to consider it.  The standard governing the Appeal Council's review of newly submitted evidence is explicitly stated in 20 C.F.R. § 404.970(b).  See Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995) (rejecting an argument that the Appeals Council was required to consider newly submitted evidence and applying the language of 20 C.F.R. § 404.970(b)); Williams v. Sullivan, 905 F.2d 214, 215-16 (8th Cir. 1990).

employment due to the combinations of [his] service connected disabilities." (Id.)  The

examination, referenced in the VA letter, was completed on March 17, 2009, after the ALJ's

decision; however, a copy of the examination report was not included in the evidence submitted

to the Appeals Council or this Court.  Therefore, the absent examination itself does not "indicate

a substantial impairment during the time period relevant to this case."  See Thornhill v. Chater,

56 F.3d 69, 1995 WL 315095, at *1 (8th Cir. 1995) (unpublished decision).

        Regarding Plaintiff's argument that the Appeals Council was required to consider the VA

letter itself, the Court disagrees.  The Appeals Council stated that it considered radiology and

laboratory reports, in addition to progress notes, from the VA dated March through July 2009,

which can be found in exhibits 22F through 27F, but found that they relate to a time after the

ALJ's decision and thus do "not affect the decision about whether you were disabled beginning

on or before February 18, 2009."  (Tr. 2).  The Appeals Council noted that Plaintiff had already

filed a claim for disability insurance benefits on July 16, 2010 and that "the above medical

evidence [was] already being considered with [his] new claim."  (Tr. 2).  Therefore, it is apparent

that the Appeals Council considered most of the medical evidence submitted by Plaintiff.  Even

if the VA letter was not considered, because of an alleged clerical error, such an error was

harmless because the letter is neither new nor material.  The Appeals Council need only consider

evidence which is (1) new, (2) material, and (3) relates to the period on or before the date of the

ALJ's decision.  Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995); Bergmann v. Apfel, 207 F.3d

1065, 1069 (8th Cir. 2000).  The Court has substantively reviewed the VA letter and finds that

remand is not necessary.[13]

---

[13] Based on the evidence presented, the Court cannot conclusively determine whether the Appeals Council received
the evidence at issue and simply did not include it in the record as a clerical error or whether the Appeals Council
never received the evidence at all.  Plaintiff's counsel provides a copy of the alleged letter insisting that the
documents listed were intended to be sent to the Appeals Council, however, this does not demonstrate that such

"To be 'new,' evidence must be more than merely cumulative of other evidence in the record."  Bergmann, 207 F.3d at 1069.  The Court finds that the VA's lettering announcing its amended determination that Plaintiff is 100% disabled, under the VA's service connected disability standards, is merely cumulative of other VA disability determinations already in the record.  The VA letter discusses only one basis for providing the higher service connected disability rate: the March 17, 2009 examination.  However, as already explained, this examination was conducted outside of the relevant period in this case and without further analysis of the specific findings of the examination,[14] the Court cannot conclude that it provides any new medical evidence regarding the earlier time period before the ALJ's decision.  Indeed, the only finding of the examination mentioned in the VA letter is that the physician assigned Plaintiff a GAF score of 50, which is squarely in the same range of GAF scores in medical records already described in many places in the social security record now before the Court.  Furthermore, as Plaintiff acknowledges, and as already discussed above, the Commissioner is not bound by the disability determination of another agency.  See 20 C.F.R. § 404.1504; Jenkins, 76 F.3d at 233.  Thus, even though the VA letter arguably presents a new finding in the VA's disability assessment process, because it fails to provide reasoning or additional medical evidence regarding the time period before the ALJ's decision, it offers no new medical evidence that is relevant or material to the determination of disability under social security regulations and standards.

For example, even if the VA letter was deemed to present some new evidence, such evidence is not material because it does not relate to Plaintiff's condition on or before the date of

documents were, in fact, sent with the letter.  Regardless, the Court will assume that the Appeals Council received the letter but failed to include it in the record; nevertheless, the Appeals Council's failure to refer and include such evidence in the record constitutes a harmless error in light of the Court's analysis as to whether the Appeals Council was even required to consider it in light of the immaterial nature of its contents.
[14] Which examination records themselves were **not** provided by Plaintiff to either the Appeals Council or this Court.

the ALJ's decision.  See Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990) ("Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision.").  Defendant appears to argue that because of the sole fact alone that the VA records "are dated well after the ALJ's decision on February 18, 2009, [they are] not material to the time period addressed by the ALJ."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 21).  However, Williams rejected such a bright line argument.  905 F.2d at 216. ("The conclusion that Dr. Wheatt's report is neither new nor material because it was rendered after the issuance of the ALJ decision is incorrect. The timing of the examination is not dispositive of whether evidence is material. If it were, all evidence obtained after the date of an ALJ decision would fail to meet the new and material standard.").  Nevertheless, the Court finds that the VA letter is not material given the circumstances in the present case.  Unlike the letter in Williams, which explained that the plaintiff suffered from a condition since early childhood (well before the onset date for the disability claim at issue), the VA letter in this present case does not provide any determination as to when Plaintiff's level of disability changed.  In fact, after citing the March 17, 2009 examination, the letter states that the "evidence shows that you are **no longer** capable of maintaining gainful employment"—suggesting that the change of disability arose more closely in time to the March 17, 2009 examination, which was after the ALJ's October of 2008 hearing in the present case.  Further, it is unclear from the VA letter why the VA awarded Plaintiff his increased service connected disability rating as of the date of his Application for Increased Compensation (May 28, 2008), rather than the later date of the medical examination. After reviewing all the late submitted evidence, the Court finds that "the newly submitted evidence is not persuasively related to [Plaintiff's] condition during the period prior to the ALJ's

decision," and therefore, the Appeals Council would not have been required to consider it. Box, 52 F.3d at 172.

A Court may remand when it is unclear whether the Appeals Council considered new and material evidence, such as when a plaintiff presents additional evidence from a physician explaining or providing an opinion that a plaintiff continues to be disabled. See Lamp v. Astrue, 531 F.3d 629, 632-33 (8th Cir. 2008); see also Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (remanding because it was not clear whether the Appeals Council considered a revised physician's opinion that further limited the plaintiff's capabilities). In this case, Plaintiff argues that the alleged clerical error failure to consider the VA letter constitutes per se reversible error, even if the letter's contents are nonetheless not ultimately material to a review of the ALJ's decision, but Plaintiff fails to provide a single case citation making such a holding under circumstances similar to this case. Moreover, aside from a conclusory argument that the Appeals Council must explain the "inconsistent decisions," Plaintiff makes no arguments under the required standard as to why this evidence is new and material.

Moreover, the Court notes that the other medical evidence spanning from June 6, 2008 to October 21, 2010 was submitted, considered by the Appeals Council, and included in the present record. Presumably, this is the evidence, at least to some extent, that the VA would have based its determination on. Indeed, Plaintiff admits that "a review of the Administrative Record, which was submitted for this appeal to the Federal Court, shows that many of the records that were submitted to the Appeals Council were part of the Administrative Record, including all of the updated medical records." (Pl.'s Mem. of Law in Supp. of Summ. J. at 12). Because the Court finds, as explained further above, that the Appeals Council considered the medical evidence from the VA which presumably went into its amended service connected disability determination and

that the ALJ's findings are otherwise supported by substantial evidence in the social security

record, even including the VA letter announcing the change in Plaintiff's service connected

disability rating, absent any clerical error that may have prevented the Appeals Council from

considering this specific VA disability determination letter was harmless error.  See Easterbrook

v. Astrue, No. 4:09CV3239, 2011 WL 3962120, at *6 (D. Neb. Sept. 8, 2011) ("For judicial

review of the denial of Social Security benefits, an error is harmless when the outcome of the

case would be unchanged even if the error had not occurred.").

## IV.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1)  Defendant's Motion for Summary Judgment [Docket No. 14] be **GRANTED**; and

2)  Plaintiff's Motion for Summary Judgment [Docket No. 6] be **DENIED**.


Dated: February 14, 2012                    s/ Leo I. Brisbois_____
                                            LEO I. BRISBOIS
                                            United States Magistrate Judge


## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 28, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.